UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH BUCKMAN, | * |
| | * |
| Petitioner, | * |
| | * |
| v. | * Civil Action No. 13-cv-11413-IT |
| | * |
| GARY RODEN, | * |
| | * |
| Respondent. | * |

MEMORANDUM AND ORDER

March 17, 2015

TALWANI, D.J.

I. Introduction

Petitioner Joseph Buckman filed this petition for a writ of habeas corpus against Respondent, Superintendent of the Massachusetts Correctional Institution, Norfolk, under 28 U.S.C. § 2254. Petitioner contends that he is being held in violation of the Constitution of the United States on the following three grounds: (1) the trial court's prohibition of prospective witnesses from the courtroom violated Petitioner's Sixth Amendment right to a public trial, (2) the trial judge's ruling prohibiting defense counsel from making a third-party culprit defense violated Petitioner's Sixth Amendment right to present a full defense to the jury and to the assistance of counsel without official interference, and (3) the prosecutor's knowing presentation of false and materially misleading testimony violated Petitioner's Fourteenth Amendment right to due process.[1]

---

[1] In his petition, Petitioner claimed a fourth ground upon which his detention was unlawful, but withdrew that ground in his opposition to Respondent's motion to dismiss. See Petr's Opp'n Respt's Mot. Dismiss, 2 [#44].

Presently before the court is Respondent's Motion to Dismiss the Petition for a Writ of Habeas Corpus [#28], which, as directed by the court, addresses the merits of all claims made by Petitioner in the petition. The briefing in connection with this motion was, therefore, treated as the briefing on the merits of the petition, and the motion and petition are now decided together. See Order of Nov. 24, 2014 [#45]. For the reasons explained below, Respondent's motion is ALLOWED and the petition is DENIED.

II.   Background

Petitioner was indicted on March 2, 1998 by a Suffolk County grand jury on one count of first-degree murder. Supplemental Answer ("SA") 3, 891. In October 1998, a jury found him guilty and he was sentenced to life in prison without the possibility of parole. SA 122. After filing a timely notice of appeal, appellate proceedings were stayed pursuant to Petitioner's requests for further investigation. Commonwealth v. Buckman, 957 N.E.2d 1089, 1093 (Mass. 2011). In March 2005, Petitioner filed a motion for a new trial in the trial court, which was ultimately denied without hearing in April 2008. Id. Thereafter, Petitioner filed a supplemental motion for a new trial, which was denied without hearing in December 2009. Id.

Before the Supreme Judicial Court of Massachusetts ("SJC"), Petitioner's appeal from those rulings was consolidated with his direct appeal. Id. After oral argument, the SJC remanded the case for further findings as to Petitioner's public trial claim. Id. In November 2011, the SJC upheld Petitioner's conviction. Id. at 1105. In December 2011, Petitioner filed a motion for rehearing, SA 1901, which was denied in February 2012, SA 798. Petitioner then filed a petition for a writ of certiorari with the United States Supreme Court, which was denied in June 2012. SA 1949. Petitioner then timely filed the instant petition with this court. See Pet. Under 28 U.S.C. § 2254 Writ Habeas Corpus [#1] [hereinafter Pet.].

III. Discussion

  *A.* *Standard*

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant a petition for a writ of habeas corpus for a claim adjudicated on the merits in state court unless the state court's decision "was [1] contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" in the state court proceeding. 28 U.S.C. § 2254(d). As to (1), a state court precedent is contrary to Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state-court decision "is also contrary to [Supreme Court] precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." Id. A state court unreasonably applies clearly established Supreme Court precedent if it applies legal principles to the facts of a case "in an objectively unreasonable manner," extends clearly established principles to a new context in which they do not belong, or refuses to extend clearly established principles to a new context in which they should apply. Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007) (citing L'Abbe v. DiPaolo, 311 F.3d 93, 96 (1st Cir. 2002)); see Williams, 529 U.S. at 407.

As to (2), a federal court may not disturb the state court's findings of fact unless a petitioner rebuts the presumption that those facts are correct with clear and convincing evidence to the contrary. § 2254(e)(1); see Sleeper, 510 F.3d at 38.

B.   *Ground 1: Violation of Sixth Amendment Right to Public Trial*

(1)   Background

Petitioner argues that his Sixth Amendment right to a public trial was violated when all potential prosecution and defense witnesses were sequestered, which prevented four identified individuals from entering the courtroom during jury selection and prevented two of those individuals from attending jury instructions and closing arguments. Pet. Attach. C, 1-2.[2] This claim was first raised in Petitioner's motion for a new trial. After the SJC remanded the case and directed the motion judge to conduct an evidentiary hearing as to this issue, the motion judge found that "[t]he credible evidence does not provide a basis to determine whether the defendant's children, any of their spouses or in-laws, or the Lockes were present in the courtroom either during impanelment or during the motion hearing that preceded impanelment." SA 01937–01938. The motion judge also found that particular law enforcement officers as well as Fay and Alan Rosenstein (the victim Susan Buckman's sister and brother-in-law) did not enter the courtroom during trial because they had been sequestered as witnesses, and that they had understood their sequestration to apply to impanelment. SA 01928-01929. Specifically, as to Fay and Alan Rosenstein, the motion judge found that the victim advocate had told them that they would not be permitted to enter the courtroom because they were sequestered and that they did not enter the courtroom until verdict. SA 01929. Moreover, the motion judge found that "[t]he evidence does establish that the court officers understood the sequestration order to apply to impanelment," and that the court officers would have asked a sequestered witness to leave or

---

[2] Respondent argues that Petitioner has not exhausted this public trial claim because Petitioner did not fairly present the claims that the public had been improperly excluded from the courtroom during jury instructions and closing arguments to the state courts. Because the court denies the petition on its merits, it need not reach the question whether Petitioner fully exhausted his public trial claim. See § 2254(b)(2).

4

would have denied entry to a sequestered witness during impanelment. SA 01938. The motion judge found, however, that "[c]ourt officers permitted all persons other than sequestered potential witnesses to enter to observe the impanelment process," and that the evidence did not establish that anyone was asked to leave the courtroom prior to impanelment or was denied entry into the courtroom after impanelment had commenced. SA 01938-01939.

After considering these findings, the SJC rejected Petitioner's claim, relying on the motion judge's finding that "'[t]he credible evidence *does not provide a basis to determine whether* the defendant's children [or any other of the defendant's family members] were present in the courtroom during impanelment or during the motion hearing that preceded impanelment' (emphasis added)." Buckman, 957 N.E.2d at 1095–96. The SJC reasoned that, based on that finding, Petitioner had failed to satisfy his burden to show that there was a partial closure of the court room. Id.

Following the SJC's decision, Petitioner petitioned the SJC for reconsideration of its judgment, arguing that the SJC had overlooked the motion judge's findings that particular law enforcement officers as well as Fay and Alan Rosenstein had been excluded from jury impanelment. SA 01906. The SJC summarily denied this petition. SA 00798.

In rejecting Petitioner's claim and denying his petition for reconsideration, the SJC adjudicated this federal constitutional claim on its merits. See Harrington v. Richter, 562 U.S. 86, 98–99 (2011); Jewett v. Brady, 634 F.3d 67, 78 (1st Cir. 2011). Consequently, this court applies AEDPA deference to the result, not the explanation, of the SJC's decision. See DiBenedetto v. Hall, 272 F.3d 1, 6 (1st Cir. 2001) ("[W]hen the state court has addressed the federal constitutional issue, it is its ultimate outcome, and not its rationalization, which is the focus."). The court, therefore, may not disturb the state court's judgment absent a decision

5

"contrary to, or involve[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d).

    (2)    Analysis

Applying this standard to Petitioner's claim, the court must deny habeas relief. In Presley v. Georgia, 558 U.S. 209, 213–14 (2010), the Supreme Court held that "the Sixth Amendment right to a public trial extends to the voir dire of prospective jurors" and that "trial courts are required to consider alternatives to closure even when they are not offered by the parties." These holdings derived from prior Supreme Court precedent based on both the Sixth and First Amendments, such as Waller v. Georgia, 467 U.S. 39 (1984), and Press–Enterprise Co. v. Superior Court of Cal., 464 U.S. 501 (1984). These cases concerned complete closures prohibiting the general public from attending some portion of the trial or pretrial process, see Presley, 558 U.S. at 210 (exclusion of the public from voir dire of prospective jurors); Waller, 467 U.S. at 42 (exclusion of the public from pretrial suppression hearing); Press–Enterprise Co., 464 U.S. at 503 (exclusion of the public from "individual voir dire [of prospective jurors] with regard to death qualifications and any other special areas"), whereas Petitioner's case concerns the disallowance of sequestered witnesses—but not the public in general—from attending trial.

Arguing against this distinction, Petitioner contends that Respondent has not "cited any authority for the proposition that Presley and Waller apply only to complete closures of the courtroom." Petr's Opp'n Respt's Mot. Dismiss, 12 [#44]. This argument flips § 2254(d)'s standard on its head. The more appropriate question is whether Petitioner's case is "materially indistinguishable" from the above-cited Supreme Court precedent, or whether denial of Petitioner's claim would result in the unreasonable application of law to the facts of the instant

case or the refusal to extend clearly established principles to a new context in which they should apply. See Williams, 529 U.S. at 405, 407.

The court finds that Petitioner cannot meet § 2254(d)'s standard. First, the prohibition of potential witnesses in Petitioner's trial does not constitute the complete closures at issue in Presley, Waller, and other Supreme Court precedent, making the facts of the instant case materially distinguishable from those cases.

Second, Waller's public trial guarantee cannot be extended to the new context of a partial closure. The purpose behind the public-trial guarantee is "that the public may see [the defendant] is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." Waller, 467 U.S. at 46 (quotation marks and citations omitted). That purpose was not defeated here as Petitioner's trial was open to the general public. And the record shows that the trial judge was keenly aware of this issue, as he told the parties during a September 18, 1998 pretrial conference to reconsider their witness lists so that persons who were unlikely to be called as witnesses could observe the trial. SA 01920. As Young v. Dickhaut, No. 10-10820, 2012 WL 3638824, at *9 (D. Mass. Aug. 22, 2012), noted: "Waller concerned the complete closure of a courtroom and not the exclusion of individual spectators. Because there is no clearly established federal law with respect to partial closures, I cannot find that the state court's ruling warrants habeas relief under AEDPA." (citation and footnote omitted).

Lastly, Petitioner argues that the trial court acted in contravention of Waller in failing to articulate the reasons for the partial closure (here, the sequestration of witnesses) in this particular case. But Waller concerned a complete closure of the courtroom, not a partial closure. The Supreme Court has not extended Waller's requirements to a partial closing, never mind the

sequestration of witnesses. See Geders v. United States, 425 U.S. 80, 87 (1976) (describing the trial court's power to sequester witnesses as "broad"). And even if Petitioner could establish that Supreme Court precedent forecloses the sequestration of witnesses pursuant to a blanket policy or practice by the trial court, or the sequestration of witnesses during the jury impanelment, closing arguments, or jury instructions portion of the proceedings, Petitioner cannot show that clearly established federal law provides Petitioner relief from any such error absent a showing of actual prejudice. Here, Petitioner has not demonstrated actual prejudice resulting from the sequestration of witnesses at his trial.

For these reasons, Petitioner's public trial claim must fail.

C. *Ground 2: Violation of Sixth Amendment Right to Present a Complete Defense*

(1) Background

Petitioner argues that his Sixth Amendment right to present a complete defense was violated when the trial judge prevented him from presenting a third-party culprit defense. Before trial, the Commonwealth filed a motion in limine seeking to preclude Petitioner from offering evidence of third-party culprit responsibility and from arguing such a theory to the jury. SA 176. On September 18, 1998, the trial court held a hearing on the parties' pretrial motions. After hearing argument on the motion to exclude third-party culprit argument or evidence, the trial judge informed the parties "that at this point, . . . it would not come in," but made no final ruling on the motion, deciding to "wait and see how the evidence will develop." Tr. Hr'g Pretrial Mots., Sept. 18, 1998, at 57.

On September 23, 1998, prior to jury selection, the Commonwealth inquired as to the trial court's ruling on that motion. Tr. Evidence, 1-35. The trial court, after hearing further argument, allowed the motion. Id. at 1-50. The trial court held that Petitioner would "certainly

8

be able to fully explore the issue of whether or not the Commonwealth did a full and proper investigation in the matter," but that "[i]n order to present that third-party culprit evidence, there has to be more than has been shown in this case." Id. 1-49–1-50.

In affirming Petitioner's conviction and denying his motions for new trial, the SJC explained that, as to this issue:

> [T]he trial judge allowed the motion in limine based on what had been presented to that point. The judge did not order the exclusion of any evidence. Instead, he merely stated that if the defendant intended to pursue third-party culprit arguments and evidence, defense counsel should provide advance warning so that the judge would be prepared to make a proper ruling.

Buckman, 957 N.E.2d at 1096. The SJC also explained that

> The trial judge did not foreclose the possibility that the defendant might be able to make a sufficient showing at trial for the admission of third-party culprit evidence. He merely suggested that there was insufficient information to make a definitive ruling at that time, and clearly indicated that the door was still open to the defendant.

Id. at 1097.

The SJC also based its ruling on Petitioner's failure to make a requisite showing that the third-party culprit evidence had substantive probative value in connecting a third person to the crime. Id. Among others, Petitioner sought to present third-party culprit evidence as to John Loder. Mr. Loder worked for Petitioner in his canteen truck business. Mr. Loder also made the initial report to the police, and, after the police failed to locate the victim in their initial search, Mr. Loder advised them that Petitioner's wife was likely in the master bedroom. Id. at 1096.

The SJC found that Petitioner had failed to show that Mr. Loder had motive or intent to commit the crime. Id. The SJC also noted that the motion judge reviewing Petitioner's motion for a new trial had concluded that the evidence concerning Mr. Loder was brought in through the testimony of Mr. Loder and other witnesses, and that Petitioner "was able to make a

9

forceful . . . argument based on the failure of police fully to investigate Loder's potential involvement." Id. at 1097-98.

Based on the record, the court finds that the SJC's finding that the trial judge had "merely suggested that there was insufficient information to make a definitive ruling at that time, and clearly indicated that the door was still open to the defendant" to present third-party culprit evidence was incorrect. Although the trial judge left the issue open at the pretrial motion hearing and asked defense counsel for advance warning prior to the introduction of third-party culprit evidence, Tr. Hr'g Pretrial Mots., Sept. 18, 1998, at 57, the judge allowed the motion five days later prior to jury selection, see Tr. Evidence, 1-50.

Nevertheless, the SJC's decision was independently based on its finding that Petitioner had failed to make the appropriate showing to admit such evidence under Massachusetts law, and that there was no violation of Petitioner's right to present relevant evidence in his own defense, particularly where much of the evidence that Petitioner proposed to offer was brought forward through testimony at trial. See Buckman, 957 N.E.2d at 1097–98. The court, therefore, will examine this basis to determine whether the SJC's decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. See § 2254(d).

(2) Analysis

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683 (1986) (internal citations omitted) (quotation marks and citations omitted). This opportunity, however, is not absolute, as "State and Federal Governments

10

unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial." United States v. Scheffer, 523 U.S. 303, 309 (1998). This "latitude under the Constitution to establish rules excluding evidence from criminal trials" is "broad," and "[s]uch rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Id. at 308 (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)). Additionally, "[the Supreme Court] ha[s] found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." Id.

In Holmes v. South Carolina, 547 U.S. 319 (2006), the Supreme Court addressed the application of a criminal defendants right to present a complete defense in the context of third-party guilt. In that case, the defendant had sought to introduce proof that another man had attacked the victim, but the trial court excluded the defendant's third-party culprit evidence, citing precedent from the South Carolina Supreme Court holding such evidence admissible only if it raises a reasonable inference or presumption as to the defendant's innocence and inadmissible if it is based on bare suspicion or conjecture as to the commission of the crime by another. Holmes, 547 U.S. at 323–24. The South Carolina Supreme Court affirmed the ruling, but also applied another of its precedents, which called upon the court to assess the strength of the Government's case in deciding such questions. Id. at 324. Reviewing this decision, the Supreme Court found that the rule that strong evidence of a defendant's guilt precludes evidence of third-party guilt was arbitrary, as the rule "d[id] not focus on the probative value or the potential adverse effects of admitting [that evidence] . . . . Nor ha[d] the State identified any other legitimate end that the rule serves." Id. at 329, 331.

In other cases where the Supreme Court found rules violating a defendant's right to present a full defense, such rules excluded important defense evidence without serving any legitimate interest. See Washington v. Texas, 388 U.S. 14, 22–23 (1967) (rule prohibiting an alleged participant in a crime from testifying in defense of another alleged participant served no legitimate interest where it allowed an alleged participant to testify if he or she had been acquitted or was a prosecution witness); Rock v. Arkansas, 483 U.S. 44, 56, 61 (1987) (per se rule barring admission of hypnotically-refreshed testimony was arbitrary where there was no clear evidence that such testimony was invalid in all instances and prevented the defendant, the only witness at the scene, from testifying in her own defense); cf. Scheffer, 523 U.S. at 309, 312, 317 (upholding a rule excluding all polygraph evidence because it was "a rational and proportional means of advancing the legitimate interest in barring unreliable evidence" and not arbitrary or disproportionate, and because the defendant's defense was not significantly impaired).

In the instant case, the SJC applied the following "well-settled" standard for admission of third-party culprit evidence in Massachusetts:

> A defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it. We have given wide latitude to the admission of relevant evidence that a person other than the defendant may have committed the crime charged. If the evidence is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility. Yet, this latitude is not unbounded . . . because [a third-party culprit defense] inevitably diverts jurors' attention away from the defendant on trial and onto the third party, and essentially requires the Commonwealth to prove beyond a reasonable doubt that the third-party culprit did not commit the crime.

Buckman, 957 N.E.2d at 1096 (quotation marks, citations, and internal citations omitted). The SJC further explained that "[t]hird-party culprit evidence is offered for the truth of the matter,

12

and as such it must have substantial probative value in connecting a third person to the crime." Id. at 1097.

Applying this standard, the SJC found that "[t]he trial judge correctly noted at the close of the evidence that the defendant failed to offer evidence that tended to show a third person had killed his wife," that "as to Loder, there was no evidence that he had motive or intent to commit the crime," and that "the evidence could have confused the jury." Id.

Petitioner makes several arguments as to this finding. First, Petitioner argues that a prime source of Loder's mental state was Loder himself, but that defense counsel was not allowed to question him on these issues. Moreover, Petitioner posits that intent to kill can be inferred from the circumstances of a killing. Second, Petitioner argues that although evidence of motive is relevant, motive is not an element of murder in Massachusetts and need not be proven to obtain a conviction. For this reason, according to Petitioner, to require proof of motive as an element of a third-party culprit is arbitrary.

As an initial matter, the Massachusetts standard for admission of third-party culprit evidence does not fall under the arbitrary rules that the Supreme Court has found as violating a defendant's right to present a complete defense. The standard is based on the state's legitimate interest in preventing prejudice and confusion. As the SJC explained, a third-party culprit defense "essentially requires the Commonwealth to prove beyond a reasonable doubt that the third-party culprit did not commit the crime," and diverts the trial away from the defendant and onto the third-party. Id. at 1096. Moreover, the standard for admissibility of such evidence—that it "tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it," and that "it must have substantial probative value in connecting a third person to the crime"—is not arbitrary or disproportionate to serving this goal, but is more similar

13

to the standard applied by the trial court in Holmes. See Holmes, 547 U.S. at 323–24 (recounting that the trial court applied the standard set forth in State v. Gregory, 16 S.E.2d 532 (1941), in which such evidence is admissible if it raises a reasonable inference or presumption as to the defendant's innocence and is inadmissible if it is based on bare suspicion or conjecture as to the commission of the crime by another); see id. at 327–28 (stating that Gregory "adopted and applied a rule apparently intended to be" of the type that is widely accepted). Thus, on its face, the Massachusetts standard does not violate Supreme Court precedent.[3]

As applied to the facts of Petitioner's case, the SJC's decision affirming the trial court's ruling did not violate clearly established federal law as determined by the Supreme Court. Importantly, the trial judge did not preclude Petitioner from vigorously arguing that the police had "rushed to judgment," pinning Petitioner down as the suspect without completing an adequate investigation and looking into other suspects. See SA 6-134. Petitioner not only made this argument, but also argued that Loder (1) had a criminal record, (2) possessed a key to Petitioner's house, and (3) knew about the cash generated from Petitioner's football card gambling business—insinuating the possibility that Loder had committed the crime. See SA 6-149. Although Petitioner was precluded from further developing the evidence and presenting a more specific argument that Loder committed the murder, that the SJC required Petitioner to

---

[3] Although Petitioner is correct that motive is not an element of murder in Massachusetts and need not be proven to obtain a conviction, the standard for admission of third-party culprit evidence in Massachusetts is stated in the disjunctive: "A defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it." Buckman, 957 N.E.2d at 1096 (quotation marks and citation omitted) (emphasis added). The standard, thus, does not require that such evidence demonstrate motive on behalf of the third party if such evidence "tends to show that another person committed the crime," id. Here, the SJC found that "[t]he trial judge correctly noted at the close of the evidence that the defendant failed to offer evidence that tended to show a third person had killed his wife" and so required Petitioner to show that Loder had motive, intent, and opportunity to commit the crime. Id. at 1097.

14

demonstrate more than mere opportunity and means, but also motive and intent on behalf of Loder to commit the crime before allowing Petitioner to make the trial about the innocence or guilt of Loder was not an unreasonable application of Supreme Court precedent.

D.    Ground 3:   Violation of Fourteenth Amendment Right to Due Process

(1)    Background

Petitioner argues that his Fourteenth Amendment right to due process was violated when, according to Petitioner, the prosecutor knowingly created a false or misleading impression that DNA testing produced evidence that Susan Buckman's blood was on Item 11-3—a sample of a strip of duct tape cut from a piece of duct tape removed from Petitioner's mouth after police discovered him in his garage.[4]

At trial, Leann Hooper, a forensic analyst for Cellmark Diagnostics, testified that, as to Item 11-3, Susan Buckman was excluded as the source of the DNA, but that Petitioner was not. SA 1672. The prosecutor then elicited further testimony from Ms. Hooper that, in addition to these results, "faint results" were obtained. Id. Ms. Hooper explained that "faint results" are not interpreted because they do not meet a threshold standard. Id. The prosecutor then asked whether it was possible for Susan Buckman's DNA to be the source of the "faint results," if the faint results were DNA from another person. SA 1672-73. Ms. Hooper answered that the "faint results" could be from another individual, and that Susan Buckman "could possibly be the source of those faint results." SA 1673. The prosecutor then asked if, therefore, it was possible that the

---

[4] In the petition, Petitioner asserts that both the prosecutor and Leann Hooper, the testifying forensic analyst, wrongly referred to Item 11-3 as duct tape that was removed from Petitioner's mouth when in fact that sample of duct tape came from the piece of tape that was removed from Petitioner's wrists. Pet. Attach. C, 9. In his opposition to Respondent's motion to dismiss, however, Petitioner does not argue this claim, but instead concedes that Item 11-3 was a piece of duct tape cut from a section of the mouth tape. See Petr's Opp'n Respt's Mot. Dismiss, 36.

15

DNA from both Petitioner and Susan Buckman were present in Item 11-3, to which Ms. Hooper replied "yes." Id.

On cross-examination, defense counsel asked "So, you can't exclude the DNA from more than one individual from . . . Item No. 11-3 . . .; isn't that correct?" SA 1678. In response, Ms. Hooper explained that "[t]hose items," including Item No. 11-3, "don't have an indication that there is DNA from more than one individual." SA 1678-79. Rather, Ms. Hooper explained that "faint results" were obtained, which are below the threshold. SA 1679. Defense counsel then asked "[b]ut you're not sure whose DNA might or might not be there; isn't that correct?" Id. After the trial court judge sustained the Commonwealth's objection to this question, Ms. Hooper again explained the significance of obtaining "faint results," stating that "[t]hose results could be due to either DNA from another individual or they could be due to a technical artifact in the test." Id. On re-direct examination, the Commonwealth asked Ms. Hooper to explain the meaning of the term "technical artifact," which she did. SA 1681. On re-cross examination, defense counsel again asked that: "Then, again, it may not be a technical artifact. It could as well be the presence of someone else's DNA; isn't that correct as well?" SA 1681-82. Ms. Hooper again replied that the results could either signify DNA from another individual or a technical artifact. SA 1682. The Commonwealth then asked whether "faint results" are not called "results" because "the faint response of levels in [the] testing is below the threshold." Id. Ms. Hooper answered, "That's correct." Id.

During closing argument, the prosecutor stated that "[I]f [the faint results contained] DNA from another person instead of a technical artifact, it's Susan Buckman," and argued that Item 11-3 contained Petitioner's fingerprint and Susan Buckman's blood. SA 1571-72.

In denying this claim, the SJC found that the analyst's "faint results" testimony was not false and that she had made a full and accurate disclosure in her trial testimony. Buckman, 957 N.E.2d at 1099. The SJC further found that

> [A] fair reading of that testimony indicated that some DNA was in fact detected, and the victim, but not the defendant, could be excluded as a source. In addition, "faint results" were obtained, but were below the Cellmark threshold for comparison and interpretation. It could not be determined whether the "faint results" were a technical artifact produced by the testing process itself or DNA from an unidentified person. If it were DNA from another person, it literally could be anybody's, even the victim's. There was no error.

Id.

### (2) Analysis

Petitioner argues for de novo review of this claim based on his assertion that the SJC did not consider the prosecutor's arguments in summation in ruling on this claim and because the SJC only scrutinized the claim under state law. Even, however, if this court were to review this claim de novo, it would find no error in the SJC's decision. Rather than object to the challenged testimony, defense counsel's strategy was to emphasize and re-emphasize on cross and re-cross examination that the "faint results" could have signified another individual's DNA, which fit its inadequate police investigation and third-party culprit evidence theories. Through multiple examinations by each party, Ms. Hooper clearly explained that the "faint results" could signify the DNA of any other individual, including Ms. Buckman, or merely consist of a technical artifact. It was the prosecutor who asked on re-direct examination whether "faint results" are not called "results" because "the faint response of levels in [the] testing is below the threshold." SA 1682. And the court agrees with the SJC that the prosecutor "properly could anticipate trial counsel's cross-examination that the DNA test results on the duct tape supported the defendant's

17

third-party culprit theory," Buckman, 957 N.E.2d at 1099, and establish the possibility that the "faint results" could signify Ms. Buckman's DNA as opposed to a potential third-party culprit.

Petitioner argues that the affidavits of Doctor Randell Libby and Doctor Robin Cotton refute Ms. Hooper's testimony. In his affidavit, Doctor Libby—relying on Ms. Hooper's own notes and conclusions—opines that "Susan Buckman is **EXCLUDED** as the source of the DNA-bearing materials observed" on Item 11-3 but also notes that the testing materials "may reveal the possible presence of a third party donor" on Item 11-3. SA 1588-89 (emphasis in original). Doctor Cotton's affidavit, in turn, opines that for Item 11-3, two faint results are observed. SA 1618. According to Doctor Cotton, one of these faint results, if from a secondary contributor and not a technical artifact, excludes Susan Buckman. Id. Thus, if the faint results are due to only a single secondary contributor, they could not have come from Susan Buckman. Id. But if there were multiple secondary contributors, "no conclusion could be drawn about the source because the results were below the threshold for interpretation." Id. Doctor Cotton, however, does not and cannot completely rule out the possibility that the "faints results" do not signify Susan Buckman's DNA or any other individual's DNA.

In the instant circumstances, the court does not find that false or misleading evidence was presented to the jury or that Petitioner's conviction was obtained through either the knowing use or presentation of false testimony or knowing creation of a false impression to the jury. See, e.g., Mooney v. Holohan, 294 U.S. 103 (1935); Alcorta v. Texas, 355 U.S. 28 (1957); Miller v. Pate, 386 U.S. 1 (1967).

III. Conclusion

For the foregoing reasons, Respondent's Motion to Dismiss the Petition for a Writ of Habeas Corpus [#28] is ALLOWED and the petition is DENIED.

IT IS SO ORDERED.

Date: March 17, 2015 /s/ Indira Talwani
United States District Judge